UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- X
                                                 :

| | |
|---|---|
| HEXIN GLOBAL LIMITED, a British Virgin Islands Corporation, and VINER TOTAL INVESTMENTS FUND, a Cayman Island Corporation | Civ. A. No. _____ |
| Plaintiffs, | **COMPLAINT** |
| vs. | |
| SINGULARITY FUTURE TECHNOLOGY LTD., a Virginia Corporation f/k/a Sino-Global Shipping America, Ltd., YANG "LEO" JIE, JING "ANGELA" SHAN, TUO "TINA" PAN, and LEI CAO, | |
| Defendants. | |

---------------------------------------------------------- X

Plaintiffs Hexin Global Limited ("Hexin") and Viner Total Investments Fund ("Viner") (collectively, Hexin and Viner are "Plaintiffs"), by and through their attorneys, Sichenzia Ross Ference LLP, as and for their Complaint against Defendants Singularity Future Technology, Ltd. f/k/a Sino-Global Shipping America, Ltd. ("Singularity" or "Company"), Yang "Leo" Jie ("Jie"), Jing "Angela" Shan ("Shan"), Tuo "Tina" Pan ("Pan"), and Lei Cao ("Cao") (Jie, Shan, Pan, and Cao, collectively are "Leadership," and together with Singularity, "Defendants") allege as follows:

## PRELIMINARY STATEMENT

1.      This is an action on behalf of Plaintiffs to recover damages caused by Defendants' common law fraud and statutory violations of the federal securities laws as well as breaches of contract.

2.      After entering into a negotiated, arms-length Securities Purchase Agreement ("SPA") with Plaintiffs on or about December 14, 2021, for which Singularity received valuable

consideration, Singularity caused a myriad of breaches of the SPA.  Those breaches include failing to file its required periodic reports (e.g., Form 10-Q) with the Securities and Exchange Commission ("SEC") rendering a key, bargained-for term of the SPA – i.e., the opportunity to timely receive unrestricted, free-trading shares of Singularity common stock acquired directly from the issuer at a discount, which was the primary purpose of the underlying investment – a nullity.  Singularity further categorically failed and refused to cure the its filing deficiencies, despite that the Company has had, at all relevant times, ample financial resources to do so, in order to frustrate Plaintiffs and destroy the benefit of the original bargain.  Because Singularity failed to honor and breached the terms of the SPA, Plaintiffs are currently unable to remove the restrictive legends on their shares of stock and sell them into the public markets.  Instead, they hold useless "paper."

3.	Singularity, Lei and Cao also fraudulently induced Plaintiffs into entering into the SPA by making, *pre*-contract, material misrepresentations and by concealing material information from Plaintiffs.

4.	Despite due demand, Singularity has failed and refused to return $6,124,910.82 that was provided by Plaintiffs.

5.	As a result of Defendants' wrongful conduct, Plaintiffs are entitled to an award for damages, punitive damages, attorneys' fees and the costs of bringing this action.

## THE PARTIES

6.	Plaintiff Hexin Global Limited ("Hexin") is a British Virgin Islands corporation having its principal place of business located in Tortola, British Virgin Islands.

7.	Plaintiff Viner Total Investments Fund ("Viner") is a Cayman Island corporation having its principal place of business located in Sha Tin, Hong Kong.

8.     Upon information and belief, Defendant Singularity Future Technology Ltd. f/k/a Sino-Global Shipping America, Ltd. ("Singularity") is a Virginia corporation having its principal place of business located at 98 Cutter Mill Road, Suite 322, Great Neck, New York.  Singularity is a public company trading on the Nasdaq Global Markets Exchange under the ticker symbol SGLY (formally SINO).

9.     For purposes of diversity, Singularity is a citizen of Virginia and New York.

10.     Upon information and belief, Defendant Yang "Leo" Jie ("Jie") is a natural person who resides at 81a Hampshire Road, Great Neck, New York, and is the former Chief Executive Officer ("CEO") and Director of Singularity.

11.     Upon information and belief, Defendant Jing "Angela" Shan ("Shan") is a natural person who resides in West New York, New Jersey, and is the current Chief Operating Officer ("COO") of Singularity.

12.     Upon information and belief, Defendant Tuo "Tina" Pan ("Pan") is a natural person who resides at 49 Elmtree Lane, Jericho, New York and was the Chief Financial Officer ("CFO") of Singularity during the occurrences at issue.

13.     Upon information and belief, Defendant Lei Cao ("Cao") a natural person who resides at 26 Holiday Pond Rd., Jericho, New York.  Cao founded Singularity, was the CEO of Singularity prior to Jie, and is currently the Chairman, President, and Vice President of Board of Directors of Singularity.

14.     For purposes of diversity, Jie is a citizen of New York.

15.     For purposes of diversity, Shan is a citizen of New Jersey.

16.     For purposes of diversity, Pan is a citizen of New York.

17.     For purposes of diversity, Cao is a citizen of New York.

18.     For purposes of diversity, Hexin and Viner are subjects of foreign states.

## JURISDICTION AND VENUE

19.     The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) in that there is complete diversity of citizenship between Plaintiffs and Defendants and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

20.     This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. § 78aa, as this action arises under federal securities laws including Section 27 of the 1934 Act.

21.     This Court has supplemental jurisdiction of Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy as, and are related to, the federal securities law claims.

22.     Venue is proper in this judicial district, pursuant to 28 U.S.C. § 1391(b)(2) and 15 U.S.C. § 78aa, as a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

23.     In addition, pursuant to Section 7.2(b) of the SPA, Plaintiffs and Singularity expressly agreed to submit to the jurisdiction of and venue in this Court:

> Each of the Company and the Purchaser hereby irrevocably submits to the jurisdiction of the United States District Court sitting in the Southern District of New York and the courts of the State of New York located in New York county for the purposes of any suit, action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby or thereby.

24.     Finally, the Court may exercise personal jurisdiction over the Defendants because they are either citizens of New York or regularly transact business within the state, engaged in some purposeful activity in the state, or committed a tortious act within the state.

## STATEMENT OF FACTS

### I. The Securities Purchase Agreements

25.     In September 2021, Plaintiffs were introduced to Cao and Jie to discuss Plaintiffs'
potential investments in Singularity.  At the time the company was called Sino-Global Shipping
America, Ltd. and operated as a global shipping and freight logistics services provider.

26.     Cao and Jie told Plaintiffs' representatives that Singularity was on the verge of
incredible growth because it was about to pursue a new line of business focusing on blockchain
technologies.

27.     On or about December 14, 2021, Plaintiffs and Singularity entered into the SPA,
pursuant to which Hexin and Viner agreed to purchase 900,000 and 978,807 shares ("Shares"),
respectively, of Singularity common stock at $3.26 per share.[1]

28.     Plaintiffs and Singularity both stood to benefit from the SPA.  Singularity received
a direct investment into the Company and avoided the expense of registering the Shares with the
SEC, while Plaintiffs acquired Shares at below-market prices.

29.     Plaintiffs, though, could not immediately sell the Shares into the public markets.
Section 2.2(g) of the SPA provides that the Shares would "bear a restrictive legend" preventing
their sale.  The Shares could only be sold after the removal of their restrictive legends pursuant to
the safe harbor from registration provided under 17 CFR § 230.144 ("Rule 144"), a regulation
promulgated under the Securities Act of 1933.

30.     Per SEC regulations, the issuer's transfer agent, in connection with a sale by the
issuer of restricted stock of the issuer, may remove the restrictive legends thereon with a legal

---

[1] A true and correct copy of the SPA is annexed hereto as Exhibit 1.

opinion, pursuant to Rule 144, that, in relevant part, opines that the issuer of the restricted shares was compliant with it public reporting requirements, and that the purchaser paid for the restricted shares at least six months before seeking to remove the legends.

Representations by Defendants

31.     A material condition of the Plaintiffs' negotiation with Singularity as well as of their subsequent investment was Plaintiffs' right to seek the removal of the restrictive legend six months after the issuance of the Shares.

32.     During the negotiations, Jie and Cao emphasized that, given the material features of the SPA, Singularity was an SEC-reporting company that had and would continue to fully comply with its reporting requirements.  Singularity further represented and warranted in the SPA that it shall comply with specific SEC reporting requirements, absent which the restrictive legends could not be removed:

- Section 3.10 Reporting Status. ***Until the date on which the Purchasers shall have sold all of the Securities*** (the "Reporting Period"), ***the Company shall timely file all reports required to be filed with the SEC pursuant to the Exchange Act*** (including any applicable extensions permitted for such filings), and the Company shall not terminate its status as an issuer required to file reports under the Exchange Act even if the Exchange Act or the rules and regulations thereunder would no longer require or otherwise permit such termination.

- Section 3.1 Securities Compliance.   The Company shall notify the Commission in accordance with its rules and regulations, of the transactions contemplated by any of this Agreement, ***and shall take all other necessary action and proceedings as may be required and permitted by applicable law, rule and regulation, for the legal and valid issuance of the Securities to the Purchaser or subsequent holders.***

- Section 3.3 Compliance with Laws. ***The Company shall comply to comply in all material respects, with all applicable laws, rules, regulations and orders***, except where non-compliance could not reasonably be expected to have a Material Adverse Effect.

Emphasis added.

33.     Plaintiffs acknowledged in the SPA at Section 2.2(j) that they might not be able to sell their Shares into the public markets if Rule 144 was not available.  Section 3.10, as detailed above, obligated Singularity to timely file its required periodic public reports, and was a material aspect of the SPA because Singularity's satisfaction of this obligation was material to Plaintiffs' ability to satisfy one of Rule 144's requirements.

34.     Cao and Jie made numerous other, material representations and warranties regarding the material facts supporting the transaction, including but not limited to the following articulated in the SPA:

- Section 2.1 Representations and Warranties of the Company and its Subsidiaries. (C) Capitalization.  (i) . . . no Common Stock are entitled to preemptive, conversion or other rights and *there are no outstanding options, warrants*, scrip, rights to subscribe to, call or commitments *of any character whatsoever relating to, or securities or rights convertible into, any shares of capital stock of the Company*[];

- Section 2.1 Representations and Warranties of the Company and its Subsidiaries. (C) Capitalization.  (ii) *there are no contracts*, commitments, understandings, or arrangements by which the Company is or may become bound to issue additional shares of capital stock of the Company *or options, securities or rights convertible into shares of capital stock of the Company*;

- Section 2.1 Representations and Warranties of the Company and its Subsidiaries. (f) Commission Documents. Financial Statements….At the time of the respective filings, the Commission Documents complied in all material respects with the requirements of the Exchange Act and the rules and regulations of the Commission promulgated thereunder and other federal, state and local laws, rules and regulations applicable to such documents. As of their respective filing dates, *none of the Commission Documents contained any untrue statement of a material fact; and none omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading*.

- Section 2.1 Representations and Warranties of the Company and its Subsidiaries. (g) No Material Adverse Effect. *As of June 30, 2021 till the date of this Agreement, the Company has not experienced or suffered any Material Adverse Effect*. For the purposes of this Agreement, "Material

Adverse Effect" shall mean (i) any material adverse effect upon the assets, properties, financial condition, business or prospects of the Company, and its Subsidiaries, when taken as a consolidated whole, and/or (ii) any condition, circumstance, or situation that would prohibit or otherwise materially interfere with the ability of the Company to perform any of its material covenants, agreements and obligations under this Agreement.

- Section 2.1 Representations and Warranties of the Company and its Subsidiaries. (k) Actions Pending. [T]here is no action, suit, claim, investigation, arbitration, alternate dispute resolution proceeding or any other proceeding pending or, to the knowledge of the Company, threatened against or involving the Company involving any of their respective properties or assets. To the knowledge of the Company, *there are no outstanding orders, judgments, injunctions, awards or decrees of any court, arbitrator or governmental or regulatory body against* the Company, the Subsidiaries or *any of their respective executive officers or directors* in their capacities as such.

- Section 3.6 No Manipulation of Price. The Company will not take, directly or indirectly, any action designed to cause or result in, or that has constituted or might reasonably be expected to constitute, the stabilization or manipulation of the price of any securities of the Company.

- Section 3.9 Use of Proceeds. The Company shall use the net proceeds from the sale of the Securities hereunder *for working capital and general corporate purposes* and shall not use such proceeds: (a) for the redemption of any Common Stock or Common Stock Equivalents, or (b) in violation of FCPA or OF AC regulations.[2]

35.     The veracity of and compliance with these representations and warranties through the Closing Date were express conditions precedent in Sections 4.2(a) and (b) of the SPA to Plaintiffs' obligation to purchase the Shares.

36.     Based on Cao's and Jie's representations and the representations articulated in the SPA, Hexin wired Singularity $163,000 on December 17, 2021 and $2,771,000 on January 3, 2022; and Viner wired Singularity $3,190,910.82 on January 4, 2022, for a total investment of

---

[2] All italics added for emphasis.

$6,124,910.82. Plaintiffs wired the funds to Singularity's corporate bank accounts in accordance with Defendants' explicit instructions.

37.     On or about January 10, 2022, Singularity issued 900,000 shares of Singularity common stock to Hexin and 978,807 shares to Viner—both on a restricted basis. TranShare, Singularity's transfer agent, registered Plaintiffs as shareholders of the Shares that day reflecting that the shares issued were fully paid for and non-assessable.

## II. Sino-Global Becomes Singularity

38.     On November 10, 2021, the Company announced in a Form 8-K filing with the SEC that Jie had been appointed as its new CEO. It also announced that Pan had been appointed as the Company's new CFO.

39.     On January 3, 2022, the Company issued another Form 8-K disclosing that it had changed its name with the Virginia State Corporation Commission from Sino-Global Shipping America, Ltd. to Singularity Future Technology Ltd.

## III. Defendants Immediately Breach the SPA

### The Warrant Buy-Back

40.     Singularity breached the SPA almost immediately. Despite expressly representing that there were no "outstanding options, warrants, scrip, rights to subscribe to, call or commitments of any character whatsoever relating to, or securities or rights convertible into, any shares of capital stock of the Company," on or about January 6, 2022, just weeks after executing the SPA and days after receipt of Plaintiff's funds, Singularity announced in a Form 8-K that it had entered into a Warrant Purchase Agreement with previous investors "pursuant to which the Company agreed to buy back an aggregate of 3,870,800 warrants (the 'Warrants') from the Sellers, and the Sellers agreed to sell the Warrants back to the Company. These Warrants were sold to these Sellers in

three previous transactions that closed on February 11, 2021, February 10, 2021, and March 14, 2018. The purchase price for each Warrant is $2.00…."

41.    None of the Defendants had disclosed those Warrants to Plaintiffs or excluded them from the explicit representation that no warrants were outstanding in Sections 2.1(c)(i) and (ii) of the SPA.

42.    In other words, one day after Singularity received an aggregate payment of over $6 million from Plaintiffs, the Leadership Defendants, upon information and belief, conspired to use the funds to buy back millions of shares exercisable by Warrants in a transaction valued at $7,741,600.

43.    They did so despite Singularity and Jie representing in (i) Sections 2.1(c)(i) and (ii) of the SPA that no warrants were outstanding; and (ii) Section 3.9 that the "Company shall use the net proceeds from the sale of the Securities hereunder for working capital and general corporate purposes," and *not* to eliminate outstanding obligations such as the Warrants.

**IV. Defendants' Misstatements and Withholding of Material Information Are Exposed**

### The Reports

44.    On or about May 5, 2022, Hindenburg Research, a third-party research and news organization, released a report alleging various examples of fraud, misrepresentations, and other actionable misconduct against Singularity and its executives (hereinafter, the "Hindenburg Report").  On the same day, Peabody Street Research also released a report alleging similar accusations (hereinafter, the "Peabody Thesis") (the "Hindenburg Report" and "Peabody Thesis" are collectively "Reports").

Jie's Alleged Criminal History

45.     Unbeknownst to Plaintiffs at the time of executing the SPA, and undisclosed by Singularity in any press releases or public SEC filings, Singularity's new CEO and Director, Yang Jie, as alleged by the Hindenburg Report, is a fugitive wanted by Chinese law enforcement officials for perpetrating a $300 million Ponzi scheme.  This fact was, and still has never been presented to Plaintiffs by Defendants.

46.     According to the Hindenburg Report, in 2015 and 2016, Jie misled thousands of investors and induced them to invest in a travel ticketing industry opportunity based, in part, on sales marketing materials that "claimed the investment would return up to 1,085% per annum with virtually no risk."

47.     The Hindenburg Report also alleged that Chinese criminal authorities investigated Jie and his co-conspirators, and "several witness testimonies revealed the funds were never actually used in 'production or business activities.' Instead, they were used in a clear-cut Ponzi scheme, wherein money from the later investors 'would be returned to the dividends of the previous investors…[and that] Yang Jie was the 'real boss' and 'actual controller' of the scheme." The Hindenburg Report alleged that Chinese officials had imprisoned 28 individuals for their participation in the scheme, with sentences ranging from 6 months to 15 years.  Jie was never sentenced because he fled China to the United States.

48.     As stated in the Hindenburg Report, Jie is still a wanted fugitive in China for his actions in the Ponzi scheme, and is "listed as an internationally wanted fugitive by the Chinese Ministry of Public Security."[3]

---

[3] Further, the Hindenburg Report alleges that Chinese media outlets obtained a letter of non-prosecution from Jie.  The letter purported to be an official Chinese document claiming that the Chinese government decided to not press charges against Jie for his participation in the Ponzi

49.     The Hindenburg Report also alleged that Jie attempted to steal $3.5 million in 2017, when he was the Vice President of Finance and the largest shareholder of a company named China Commercial Credit, Inc. ("CCCR").

50.     According to the Hindenburg Report, CCCR had entered into discussions with Shanghai Wheat Asset Management Co., Ltd. concerning a possible reverse merger.  As part of that merger, $3.5 million was to be held in escrow, to be paid to Jie upon consummation.

51.     Jie, though, allegedly worked with a rogue employee of the entity that paid the $3.5 million into escrow to divert the funds into an account owned by Jie in China rather than the proper escrow account.

52.     Defendants did not disclose either of these separate fraudulent and criminal actions in their November 1, 2021 Form 8-K disclosing Jie's appointment as CEO.  Rather, the Form 8-K states, "Mr. Yang Jie, 37 years old, is presently serving as the Vice President of the Registrant. Mr. Yang Jie started his work with the Registrant from January 2021. From November 2016 to June 2021, Mr. Yang Jie served as the General Manager of an entity called China Commercial Credit, Inc."

53.     The material inaccuracy of this information is breathtaking.  Had Singularity been honest and candid in its pre-contract negotiations with Plaintiffs and in its representations and warranties to Plaintiffs in the SPA, Plaintiffs never would have entered into the SPA and provided Singularity with over $6 million, which was subsequently received, retained, and spent by Singularity, while Jie served as CEO.

---

scheme.  In response, the Hindenburg Report continues, Chinese officials stated, "Since we still do not have Yang Jie in custody, the Letter of Decision not to press charges presented by Yang Jie that you submitted to us is clearly fabricated, and Yang Jie is suspected of forging official government documents."

54.     Rather than reveal the truth about its CEO, Singularity represented and warranted in Section 3.3 of the SPA that the "Company shall comply to comply in all material respects, with all applicable laws, rules, regulations and orders;" and in Section 2.2(k) that "there are no outstanding orders, judgments, injunctions, awards or decrees of any court, arbitrator or governmental or regulatory body against the Company, the Subsidiaries or any of their respective executive officers or directors..."

55.     Even the contents of the November 1, 2021 Form 8-K were inaccurate and false. As set forth in the Form 10-K filed by CCCR for the fiscal year ended December 31, 2017, Jie resigned his position as Vice President on February 20, 2018, not June 2021.

56.     Lei Cao and Singularity also omitted these material facts in a press release to PRNewswire issued the same date as the Form 10-K.  Rather, the departing CEO, Lei Cao, was quoted as follows: "Mr. Yang 'Leo' Jie is an ***outstanding executive*** who knows our business and will lead Sino- Global in this rapidly evolving business environment. He has worked closely with me and the Board over the past year and is the right choice to guide Sino-Global into the new era. I am highly confident Mr. Yang 'Leo' Jie has the insight and judgment to deliver the leadership we need today and longer-term." (emphasis added).

57.     The market initially responded quite favorably to the announcement of Jie's hiring as Singularity's CEO, driving the Company's share price up to a high of $19.86 on April 4, 2022. However, after the Reports were released one month later, on May 5, 2022, the shares closed at $4.80, and continued retreating to a low of $2.94 on June 30, 2022.

58.     Investors also took to social media site StockTwits[4] to mock the CEO and voice their concerns about the blatant misrepresentations by Jie, Cao and Singularity, posting, for example,

- "$SLGY what surprised to me is why a fugitive went public for every one to find him. He must love spotlight. Not a good attribute for criminal." @AlwaysSellOptions, May 5, 2022, 08:47AM.

- "SGLY is run by a wanted Chinese criminal? This is a perfect example of the dark side of the stock market; In it's ideal state, it's a place where honest people can profit by investing in honest business trying to hopefully do positive things, but unfortunately it also attracts the worst criminals like this creep Yan Jie who's an outright, lying criminal…" @The Rocking Horse Winner, May 8, 2022, 12:16PM.

- "$SGLY Why is this listed if the CEO is a fraud and on the run?" @PeaCy___, May 9, 2022, 10:06AM.

- "$SGLY The CEO is a fugitive wanted for running a Ponzi scheme in China. He's still a wanted man in China. Just one of the many red flags of a company who claims a lot but proves nothing." @LongShare, May 24, 2022, 01:16PM.

59.     Since the Reports were released, Singularity's share price has dropped 85 percent from a high of $19.86 on April 4, 2022 to a low of $2.94 on June 30, 2022.

60.     Due to Defendants' collective failure to inform the investing public of Jie's criminal and fraudster history when he became CEO in November 2021, it created the illusion of his fitness for the position of CEO, causing reasonable investors to believe that his previous experience would help him lead Singularity to new successful ventures.

---

[4] StockTwits is a social media platform similar to Twitter that allows investors, traders, and entrepreneurs to connect in real-time to discuss publically traded companies.

<u>The Parties' Reaction to the Reports</u>

61.     One day after the release of the Reports, Singularity issued another Form 8-K disclosing its formation of a "special committee" and engagement of the law firm Blank Rome LLP, to "investigate claims of alleged fraud, misrepresentation, and inadequate disclosure related to the Company and certain of its management personnel raised in the report of Hindenberg Research dated May 5, 2022 and other related matters."

62.     On or about July 7, 2022, Plaintiffs emailed Pan a letter in which Plaintiffs highlight the fraud and deception perpetrated by Singularity and its Leadership. The letter provides, in relevant parts:

- Hexin Global Limited, Viner Total Investments Fund […] have entered into a definitive agreement dated December 14, 2021 with [Singularity].

- Both parties agreed that the investment money will be used for blockchain, big data, cloud computing and other business development.

- The research organization Hindenburg Research issued a short sale report on May 5, 2022, noting the following significant problems with the company. 1. the company's chief executive officer, Yang Jie, is suspected of criminal offences in mainland China and is at large 2. the company inflated its results and had numerous undisclosed connected transactions. 3. the company did not carry out substantial blockchain business and speculated on the blockchain concept out of thin air.

- The Company never informed the investors of the above information. The investors suspect that the Company has concealed the true operating conditions of the Company in order to obtain this investment.

63.     Plaintiffs also accused Singularity of the following misconduct:

- 1. Since the Company received the investment from our party, it did not carry out cryptocurrency-related business in accordance with the agreement between the two parties and did not invest the fixed-investment amount into blockchain business development, which seriously violated the intention of the investors, resulting in the lack of effective growth for the Company's performance, and the share price fluctuated significantly and returned to the lower point.

- 2. the Company did not take the initiative to disclose the true operating conditions of the Company to the investors before the investment and failed to inform the management team, corporate governance, business development and other potential risks, which is suspected of fraud.

64.     Plaintiffs demanded, *inter alia*, that Singularity compensate the Plaintiffs for the fraud and deceit.  Pan did not respond to the Plaintiffs' demand letter.

65.     Singularity issued a Form 8-K dated August 9, 2022 announcing that Jie resigned from his position as CEO of Singularity and from his position as Director of Singularity's board "following the Board's decision on August 8, 2022, which adopted the Special Committee's recommendation that Mr. Jie be suspended immediately as the Company's CEO, pending the Special Committee's further investigation into allegations raised in the report of Hindenburg Research dated May 5, 2022 and other related matters."

**V. Singularity's Subsequent Filing Failures**

66.     After Jie resigned, Singularity stopped filing its required periodic public reports.  It was obligated to file a 10-Q relating to the fiscal quarter ending March 31, 2022 with the SEC by May 16, 2022, but did not.

67.     Rather, on May 17, 2022, Singularity filed a Form NT 10-Q, in which it represented to the SEC, the Nasdaq Stock Market LLC ("Nasdaq"), and the investing public that it would file its Form 10-Q within five days.  Singularity also stated in the Form NT 10-Q that it suffered "a net loss of approximately $5.1 million for the three months ended March 31, 2022, an increase of approximately 46.0%, as compared to $3.5 million for the same period in 2021."

68.     On May 24, 2022, Singularity received a notice of delinquency from the Listing Qualifications Department of Nasdaq notifying Singularity of its filing noncompliance under Nasdaq List Rule 5250(c)(1) ("Delinquency Notice").  Singularity disclosed the Delinquency Notice in a Form 8-K the next day, revealing that Singularly had 60 days to submit its remedial

plan, at which point Nasdaq *could* grant an extension to file its 10-Q to November 21, 2022. However, if Singularity did not file its 10-Q, or if Nasdaq rejected the plan, Singularity stock becomes subject to delisting.

69.    Singularity and its Leadership had until July 23, 2022 to submit a plan to Nasdaq. As of the date of this filing, they have failed to make any public filing to evidence compliance with the Delinquency Notice.

70.    Likewise, Singularity has not filed its Form 10-Q for the first quarter ended March 31, 2022 (due May 16. 2022), or the second quarter ended June 30, 2022 (due August 15, 2022).

71.    In sum, Singularity appointed a criminal fraudster, Jie, as its CEO and failed to disclose his highly material past to Plaintiffs or the investing public.

72.    Singularity implicitly acknowledged Jie's criminal and fraudulent past by failing to dispute the Reports and, upon information and belief, forcing him to resign.

73.    Singularity and Jie's failure to disclose Jie's past to Plaintiffs were part of a series of misrepresentations and omissions designed to induce Plaintiffs to invest over $6 million into Singularity, and included that Plaintiffs' Shares would not be diluted by outstanding warrant obligations; that Singularity would use the consideration paid by Plaintiffs for operations rather than to pay back outstanding obligations; and that it had complied with all laws, including SEC-imposed disclosure obligations.

74.    Singularity's wrongdoing culminated in its failure to stay current with its periodic reporting obligations, resulting in the threat of delisting and the virtual elimination of any hope for Plaintiffs to receive the benefit of their bargain – i.e., publicly-tradeable Shares.

75.    Despite Plaintiffs' material and complete performance of their obligations under the SPA, Singularity's breach of the SPA and its Leadership's myriad other forms of actionable

misconduct discussed above and below have caused Plaintiffs to suffer damages of no less than $6,124,910.82, plus attorneys' fees and costs associated with this litigation.

**COUNT I**
**(Fraudulent Inducement against Singularity, Jie, and Cao)**

76.    Plaintiffs incorporate each and every allegation set forth above as if more fully set forth herein.

77.    Singularity and Jie, signatory to the SPA, made misrepresentation and omissions of material facts to Plaintiffs as set forth above, including without limitation by falsely representing to Plaintiffs that:

 a.  Singularity and Jie intended to use the funds obtained from Plaintiffs to finance their emerging blockchain ventures and would not use the funds to redeem any common stock equivalents in accordance with SPA Section 3.9;

 b.  Singularity's SEC filings fully disclosed all material facts relating to Singularity and/or its Leadership in accordance with SPA 2.1(f);

 c.  There were no outstanding orders, judgments, injunctions, awards or decrees of any court, arbitrator or governmental or regulatory body against Singularity's executive officers or directors, including Jie in accordance with SPA 2.1(k); and

 d.  Singularity had no outstanding warrants in accordance with SPA 2.1(c)(i) and (ii);

78.    Each statement was materially false and misleading because:

 a.  Singularity and Jie intended to, and did, use the consideration paid by Plaintiffs to buy back outstanding warrants rather than in connection with Singularity's business.

 b.  Singularity's SEC filings did not fully disclose all material facts relating to Singularity and/or its Leadership, as Singularity's then-CEO and Director, Jie, was wanted by the Chinese criminal authorities for allegedly running a Ponzi scheme

- 18 -

and was recently accused of attempting to steal $3.5 million in connection with the merger of a business in which he was Vice President.

c.   There were outstanding orders, judgments, injunctions, awards or decrees of any court, arbitrator or governmental or regulatory body against Jie, Singularity's then-CEO, as the Chinese Ministry of Public Security was seeking Jie to bring criminal charges against him and instituted formal proceedings to arrest him (including by issuing a "red notice," according to the Hindenburg Report, which is the "highest level" warrant).

d.   Singularity had warrants outstanding that could be converted to shares when it entered into the SPA, thus materially diluting the Plaintiffs' Shares.

79.   Singularity and Jie knew or had reason to know these representations were false when they were made because Jie acted on behalf of Singularity, and as CEO he knew or should have known the source of funds for a nearly $8 million Warrant-buy back.

80.   Jie also knew about his own criminal and fraudulent background.

81.   Jie knew, should have known, or would have been reckless in not knowing that his background was material information for purposes of Singularity's publicly-filed SEC disclosure obligations and was material to any reasonable investor.

82.   As CEO Jie knew or should have known that Singularity had warrants outstanding when it entered the SPA.

83.   Singularity and Jie deliberately made these misrepresentations and omissions to induce Plaintiffs to enter the SPA.

84.   Lei Cao fraudulently induced Plaintiffs to enter the SPA by, among other misstatements, praising Jie as an "an outstanding executive" with "insight and judgment" who would lead Singularity to success.

85.     This was false, as Jie had engaged in criminal and fraudulent actions, including by taking advantage of his role as an officer of CCCP to divert $3.5 million.

86.     As the former CEO of Singularity, Cao knew, or should have known with reasonable diligence, or was reckless in not knowing Jie's criminal and fraudulent history, particularly because Jie was being hired to take Cao's place.

87.     Cao deliberately made these misrepresentations to induce Plaintiffs to enter the SPA.

88.     Singularity, Jie and Cao fraudulently induced Plaintiffs to enter the SPA by failing to disclose Jie's criminal and fraudulent history in Singularity's November 1, 2021 Form 8-K, which omitted any mention of Jie's criminal and fraudulent past.

89.     The Form 8-K was false and omitted material facts because it did not disclose Jie's criminal and fraudulent past.

90.     Singularity, Jie and Cao had a duty to disclose Jie's past because, as a public company and representatives of a public company, they had a continuing duty to disclose and not omit material facts.

91.     Jie's criminal and fraudulent past was a material fact that Plaintiffs could not have discovered with reasonable diligence.

92.     Singularity, Jie and Cao deliberately made each of the foregoing misstatements and omissions to induce the Plaintiffs to enter into the SPA.

93.     Plaintiffs relied to their detriment on each of the foregoing misstatements and omissions by entering the SPA.

94.     Plaintiffs' reliance on each of the foregoing misstatements and omissions was both reasonable and justified because they could not have discovered the truth with reasonable diligence.

95.     Plaintiffs' reliance on each of the foregoing misstatements and omissions was both reasonable and justified because Plaintiffs had no reason to doubt the truthfulness of Singularity, Jie and Cao because they had a statutory obligation to reveal true and material facts in their public disclosures.

96.     Plaintiffs' reliance on each of the foregoing misstatements and omissions was both reasonable and justified because Singularity, Jie and Cao were in a superior position of knowledge and are the only ones to know if these representations were true.

97.     But for the foregoing misstatements and omissions, Plaintiffs would not have entered into the SPA.

98.     Defendants are therefore liable for all resulting harm caused to Plaintiffs.

99.     As a direct and proximate result of relying on the foregoing misstatements and omissions Plaintiffs were damaged by paying too much for the Shares.

100.    Specifically, Plaintiffs were fraudulently induced to enter into the SPA due to the foregoing misstatements and omissions, as a result of which Plaintiffs were damaged in the amount of $6,124,910.82, representing the consideration the Plaintiffs were fraudulently induced to pay.

101.    As a result of the fraudulent inducement of the SPA, Plaintiffs are entitled to an award of damages in an amount to be proved at trial, but no less than $6,124,910.82, plus costs, interest, attorneys' fees, and punitive damages.

102.    In the alternative, as a result of the fraudulent inducement of the SPA, Plaintiffs are entitled to rescission of the SPA and rescissory damages in the amount of no less than $6,124,910.82, representing the consideration the Plaintiffs were fraudulently induced to pay, plus costs, interest, attorneys' fees, and punitive damages.

## COUNT II
### (Breach of Contract as against Singularity)

103.     Plaintiffs incorporates each and every allegation set forth above as if more fully set forth herein.

104.     The SPA is a binding contract between Plaintiffs and Singularity.

105.     Plaintiffs have fully performed their obligations under the SPA, including furnishing over $6,124,910 in consideration.

106.     Section 3.10 of the SPA provides:

Reporting Status. Until the date on which the Purchasers shall have sold all of the Securities (the "Reporting Period"), ***the Company shall timely file all reports required to be filed with the SEC pursuant to the Exchange Act*** (including any applicable extensions permitted for such filings), and the Company shall not terminate its status as an issuer required to file reports under the Exchange Act even if the Exchange Act or the rules and regulations thereunder would no longer require or otherwise permit such termination.

Emphasis added.

107.     Section 3.1 of the SPA provides, in relevant part, "The Company shall [...] take all other necessary action and proceedings as may be required and permitted by applicable law, rule and regulation, for the legal and valid issuance of the Securities to the Purchaser or subsequent holders."

108.     As of the date of this filing, Singularity did not file its 10-Q Report with the SEC by May 16, 2022 or May 23, 2022.  Likewise, Singularity has not filed its Form 10-Q for the second quarter ended June 30, 2022 (due August 15). Singularity is under the threat of delisting by NASDAQ.

109.     As such, Singularity has breached Sections 3.10 and 3.1 of the SPA.

110.    Singularity's breach has harmed Plaintiffs because Plaintiffs cannot seek to have the restrictive legends removed from the Shares absent Singularity's compliance its SEC-mandated periodic reporting obligations.

111.    Section 3.3 of the SPA provides, "<u>Compliance with Laws.</u> The Company shall comply to comply [*sic*] in all material respects, with all applicable laws, rules, regulations and orders, except where non-compliance could not reasonably be expected to have a Material Adverse Effect."

112.    Section 2.2(g) of the SPA defines Material Adverse Effect as "any condition, circumstance, or situation that would prohibit or otherwise materially interfere with the ability of the Company to perform any of its material covenants, agreements and obligations under this Agreements."

113.    Prior to and after signing the SPA, Singularity did not disclose to Plaintiffs nor the investing public the criminal history of Jie, in violation of applicable SEC rules and regulations imposing ongoing disclosure obligations requiring the timely disclosure of all information that would be material to an investor's investment decision.

114.     After Jie's malfeasance became public knowledge via the Reports, the investing public reacted by selling their holdings, resulting in Singularity's share price falling 85 percent from a high of $19.86 on April 4, 2022 to a low of $2.94 on June 30, 2022.

115.    The precipitous fall in Singularity's stock price shows that Jie's criminal and fraudulent background was material to investors' investment decisions, and as such, should have been disclosed in Singularity's Form 8-K filed on November 1, 2021.

116.    Singularity's failure to disclose Jie's criminal and fraudulent background was a violation of applicable SEC rules and regulations and breached Section 3.3 and 2.2(f) of the SPA.

117.    Plaintiffs have been damaged by Singularity's breach.

118.     Furthermore, and upon information and belief, Singularity breached the SPA by using a portion of Plaintiffs' funds to buy back Warrants of previous investors in violation of Section 3.9.

119.     All of the foregoing acted to artificially manipulate the price of Singularity common stock in violation of SPA Section 3.6.

120.     By reason of the foregoing, Plaintiffs have been and continue to be damaged in an amount to be determined at trial, but believed to exceed $6 million, plus interest, costs, and fees, and attorneys' fees.

**COUNT III**
**(Unjust Enrichment as to Singularity)**

121.     Plaintiff incorporates each and every allegation set forth above as it fully set forth herein.

122.     Plaintiffs conferred a benefit upon Singularity by investing over $6,124,910 in Singularity through the SPA.

123.     Singularity voluntarily accepted and retained the benefits of Plaintiffs' cash consideration.

124.     It would be against equity and good conscience to allow Singularity to retain the benefit of Plaintiffs' cash consideration.

125.     Singularity's failure to make its required periodic public filings is preventing Plaintiffs from obtaining and delivering a Rule 144 opinion to cause the removal of the restrictive legends on the Shares, allowing them to be sold on the public market, and is unjust and to Plaintiffs' detriment.

126.     Singularity is not entitled to prevent Plaintiffs from complying with Rule 144 and seeking the removal of the restrictive legends by failing to comply with its periodic public filing requirements.

127.     As a direct and proximate result of the above-described conduct, Plaintiffs have been damaged, and Singularity has been unjustly enriched by its retention of the cash paid for the Shares.

## COUNT IV
### (Specific Performance as to Singularity)

128.     Plaintiffs incorporate each and every allegation set forth above as if more fully set forth herein.

129.     Pursuant to the SPA and under SEC and NASDAQ regulations, Singularity is obligated to remain current with its filings, including quarterly financial reports.

130.     Despite its obligation to do so, Singularity has failed to remain current on its filings by failing to file its March 31, 202210-Q by May 16, 2022 or May 23, 2022 on extension, respectively.

131.     As a result, Plaintiffs are unable to obtain an opinion from counsel, in the form commonly known as a Rule 144 Opinion, seeking to have the restrictive legends removed to allow the Shares to be sold into the public market.

132.     As a result, Plaintiffs have suffered damages.

133.     Plaintiffs have no adequate remedy at law.

134.     In the absence of injunctive relief and specific performance, Plaintiffs will suffer irreparable harm.

135.     Section 7.2(a) of the SPA provides:

Specific Performance, Consent to Jurisdiction. The Company and the Purchaser acknowledge and agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. ***It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent or cure breaches of the provisions of this Agreement and to enforce specifically the terms and provisions hereof or thereof, this being in addition to any other remedy to which any of them may be entitled by law or equity***.
(emphasis added).

136. Calculating damages may be difficult due to the low daily volume of Singularity shares exchanged in the public markets.

137. By contrast, specific performance requiring Singularity to bring its public filings up to date would allow Plaintiffs to seek to have the Shares' restrictive legends removed.

138. Calculating Plaintiffs' damages is not as certain, prompt, complete and efficient as an order directing Singularity to bring its public filings up to date.

139. If this Court does not grant specific performance, Plaintiffs will be further injured.

140. On May 24, 2022, Singularity received a Delinquency Notice from the Listing Qualifications Department of Nasdaq notifying Singularity that its failure to file its March 31, 2022 10-Q is out of compliance with Nasdaq List Rule 5250(c)(1).  Singularity had 60 days to submit its remedial plan, at which point Nasdaq could grant an extension to file its March 31, 2022 10-Q to November 21, 2022.  However, if Singularity does not file its March 31, 2022 10-Q, or if NASDAQ rejects the plan, Singularity stock becomes subject to delisting.

141. If Singularity is delisted, Plaintiffs' Shares will be virtually worthless.

142. According to Singularity's NT 10-Q filed with the SEC on or about May 17, 2022, Singularity suffered a net loss of approximately $5.1 million during the first quarter of 2022.

143.    Without immediate remedial relief, it is unlikely that Singularity will be able to pay any monetary relief this Court awards Plaintiffs at the conclusion of this action.

144.    Plaintiffs therefore seek an Order enjoining and requiring Singularity to remain current on its filings with the SEC and to comply with the terms of the SPA.

## COUNT V
### (Conversion as to Singularity)

145.    Plaintiffs incorporate each and every allegation set forth above as if more fully set forth herein.

146.    As a result of Plaintiffs' compliance with the SPA and payment for the Shares, they are entitled to receive Singularity's full performance of its obligations under the SPA, including under Sections 3.1 and 3.10.

147.    However, Singularity has not "take[n] all other necessary action and proceedings as may be required and permitted by applicable law, rule and regulation, for the legal and valid issuance of the [shares]" nor have they "timely file[d] all reports required to be filed with the SEC," but has, instead, neglected to abide by the periodic reporting requirements of the Securities Exchange Act.

148.    Plaintiffs' right to possession of such unrestricted Shares is superior to any right of possession of such shares on the part of Singularity.

149.    Plaintiffs desire to have the restrictive legends removed but are unable to do so because of Singularity's failures to abide by lawful and contractually required reporting requirements.

150.    As a result of Singularity's failures, Singularity has converted the Shares.

151.    As a result of Singularity's conversion of the Shares, Plaintiffs have been damaged.

152.     Therefore, Plaintiffs are entitled to an award against Singularity in an amount to be determined at trial, but believed to exceed $6 million, plus interest, costs, fees, and attorneys' fees.

153.     In the alternative, if the Court finds that monetary damages are inadequate due to the fungible nature of common stock, Plaintiffs have no adequate remedy at law, and are therefore entitled to preliminary and permanent injunctive relief to remedy such conversion.

## COUNT VI
**(Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder as to Defendants)**

154.     Plaintiffs incorporate each and every allegation set forth above as if more fully set forth herein.

155.     During the relevant time period, Defendants carried out a plan, scheme, and course of conduct which was intended to, and did: (1) deceive Plaintiffs as alleged herein; and (2) cause Plaintiffs to enter into and SPA at artificially inflated prices.

156.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Singularity securities in an effort to maintain artificially high market prices for Singularity securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Defendants are either primary participants in the wrongful and illegal conduct charged herein or are control persons as alleged below.

157.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, and leadership, as specified herein.

158.     Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Singularity's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Singularity, its business operations, and its leadership in the light of the circumstances in which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Plaintiffs.

159.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

160.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages in connection with their purchases Singularity common stock, in an amount to be determined at trial, but believed to exceed $6 million, plus interest, costs, fees, and attorneys' fees.

### COUNT VII
### (Violation of Section 20(a) of the Exchange Act as to the Leadership Defendants)

161.     Plaintiffs incorporate each and every allegation set forth above as if more fully set forth herein.

162.     Defendant Yang Jie acted as a control person of Singularity within the meaning of Section 20(a) of the Exchange Act as alleged herein.

163.     By virtue of his high-level position as CEO and Director, and his direct participation in and awareness of the material false statements and omissions provided to Plaintiffs as part of the negotiations for and Closing of the SPA, Jie had the power to influence and control,

and did in fact influence and control, directly or indirectly, the decision-making of Singularity, including the content and dissemination of the various statements and omissions which Plaintiffs contend were false and misleading.   Jie was provided with or, by virtue of his position, had unlimited access to copies of Singularity reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

164.    Defendants Jing "Angela" Shan and Tuo "Tina" Pan acted as control persons of Singularity within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions as c-suite executives and vice presidents, Shan and Pan had direct and supervisory involvement in the day-to-day operations of Singularity and, therefore, are presumed to have had the power to control or influence the particular actions and omissions giving rise to the securities violations as alleged herein, and exercised the same.  Shan and Pan were provided with or had unlimited access to copies of Singularity reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

165.    Defendant Lei Cao, as a director, had direct and supervisory involvement in the day-to-day operations of Singularity and, therefore, have the power to control or influence the particular actions and omissions giving rise to the securities violations as alleged herein, and exercised the same.

166.    As set forth above, the Leadership Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as control persons, Leadership Defendants are liable pursuant to Section 20(a) of the Exchange Act.

167.     As a direct and proximate cause of the Leadership Defendants' wrongful conduct, Plaintiffs have suffered damages in connection with their purchases Singularity common stock, in an amount to be determined at trial, but believed to exceed $6 million, plus interest, costs, fees, and attorneys' fees.

<u>COUNT VIII</u>
**(Costs, Expenses, & Attorneys' Fees as to Singularity)**

168.     Plaintiffs incorporate each and every allegation set forth above as if more fully set forth herein.

169.     In accordance with the SPA between Plaintiffs and Singularity, Singularity agreed to pay all costs and expenses, including reasonable attorneys' fees and expenses, incurred by Plaintiffs due to Singularity's breach of the SPA.

170.     SPA Section 6.1 provides in revenant part:

> The Company agrees to indemnify and hold harmless the Purchaser (and their respective directors, officers, managers, partners, members, shareholders, affiliates, agents, successors and assigns) from and against any and all losses, liabilities, deficiencies, costs, damages and expenses (including, without limitation, reasonable attorneys' fees, charges and disbursements) incurred by the Purchaser as a result of any inaccuracy in or breach of the representations, warranties or covenants made by the Company herein.

171.     Therefore, Plaintiffs are entitled to an award against Singularity for costs and expenses incurred in procession of this lawsuit, including reasonable attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the Court enter judgment in Plaintiffs' favor as follows:

(a)     As to Count I, damages in an amount to be determined at trial, but believed to exceed $6 million, plus punitive damages, interest, costs, fees, and attorneys' fees; or in the

alternative an order of rescission of the SPA and rescissory damages in the amount of no less than $6,124,910.82, plus interest, costs, fees, and attorneys' fees;

(b)     As to Count II, damages in an amount to be determined at trial, but believed to exceed $6 million, plus interest, costs, fees, and attorneys' fees;

(c)     As to Count III, the fair market value of 1,878,807 shares of Singularity common stock, and interest thereon, as of the date Plaintiffs were entitled to apply for removal of the restrictive legends on their shares;

(d)     As to Count IV, an Order of preliminary and permanent injunctive relief directing Singularity to cause the satisfaction of all conditions under Rule 144 to enable Plaintiffs to obtain and deliver a Rule 144 Opinion to the transfer agent instructing it to remove the restriction on Plaintiffs' Shares;

(e)     As to Count V, damages in an amount to be determined at trial, but believed to exceed $6 million, plus interest, costs, and fees, including attorneys' fees; or in the alternative an Order of preliminary and permanent injunctive relief to remedy Defendants conversion;

(f)     As to Count VI, damages in an amount to be determined at trial, but believed to exceed $6 million, plus interest, costs, fees, and attorneys' fees;

(g)     As to Count VII, damages in an amount to be determined at trial, but believed to exceed $6 million, plus interest, costs, fees, and attorneys' fees;

(h)     As to Count VIII, an award of costs, including but not limited to attorneys' fees; and

(i)      Such other and further relief as the Court shall deem just, equitable, and proper

under the facts and circumstances of this case.


Dated:  New York, New York
          September 23, 2022

Respectfully submitted,

SICHENZIA ROSS FERENCE LLP

*/s/ John J. Elliott*
Michael H. Ference, Esq.
Daniel Scott Furst, Esq.
John J. Elliott, Esq.
1185 Avenue of the Americas, 31st Floor
New York, New York 10036
T: (212) 930-9700
F: (212) 930 9725

*Attorneys for Plaintiffs*