UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X
                                   :

In re SINGULARITY FUTURE TECHNOLOGY     :   Case No. 22-cv-08160-LJL
LTD. LITIGATION                           :

------------------------------------------------------------------- X
                                   :   **AFFIRMATION IN SUPPORT**

This Document Relates to:               :
                                   :
Hexin Global Limited, et al. v. Singularity   :
Future Technology, et al. 22-cv-08160      :

St. Hudson Group, LLC, et al. v. Singularity
Future Technology, et al. 22-cv-10290
---------------------------------------------------------------    X

       James J. Mahon, an attorney duly admitted to this court and to the highest courts of the

State of New York, hereby affirms and states as follows under penalties of perjury:

       1.     I am a partner of the law firm of Becker & Poliakoff LLP, attorneys for Defendant

Yang "Leo" Jie (hereinafter referred to as "Defendant" "Yang Jie" or "Mr. Jie") and I am familiar

with the facts and circumstances as set forth below.

## PROCEDURAL HISTORY

       2.     This matter has its genesis in the filing of a Complaint by Hexin Global Limited

and Viner Total Investments (referred hereinafter collectively as the "Hexin Plaintiffs") against

Singularity Future Technology, Ltd ("Singularity"), Yang "Leo" Jie, Jing "Angela" Shan, Tuo

"Tina" Pan, and Lei Cao on October 7, 2022. (the "Hexin Complaint" or "Hexin Action").  A true

and correct copy of the complaint filed by the Hexin Plaintiffs is annexed as **Exhibit A** (also

referred to herein at times as "Hexin Compl." or the "Hexin Complaint")

3.      The Hexin Complaint sets forth Eight causes of action arising out of an investment relationship that culminated with the execution of a Securities Purchase Agreement on December 14, 2022.  A true and correct copy of that Securities Purchase Agreement is annexed as **Exhibit B**. (hereinafter referred to as the "Hexin Securities Purchase Agreement" or "Hexin SPA."

4.      Relevant to the instant motion, the Hexin Complaint targets three causes of action toward Mr. Jie for common law fraud (Count I), violations of Section 10(b) of the Exchange Act and Rule 10b-5 (Count VI), and violation of Section 20(a) of the Exchange Act.

5.      Two months later, a separate action was brought by the filing of a Complaint by St Hudson Group LLC, Imperii Strategies LLC, Isyled Technology Limited, and Hs-Qynm Family Inc. (referred hereinafter collectively as the "St. Hudson Plaintiffs") against Singularity Future Technology, Ltd, Yang "Leo" Jie, Lei Cao, Jing "Angela" Shan, Tuo "Tina" Pan on December 8, 2022 (the "St Hudson Complaint" or "St. Hudson Action").  A true and correct copy of the St. Hudson Complaint is annexed as **Exhibit C** (also referred to herein at times as "St. Hudson Compl." or "St. Hudson Complaint")

6.      The St. Hudson Complaint sets forth Eight causes of action arising out of an investment relationship that culminated with the execution of a Securities Purchase Agreement on December 14, 2022.  A true and correct copy of that Securities Purchase Agreement is annexed as **Exhibit D**. (hereinafter referred to as the "St. Hudson Securities Purchase Agreement" or "St. Hudson SPA").

7.      The Hexin and St. Hudson Complaints are also referenced herein as the "Complaints."

8.     Both the Hexin and St Hudson Complaints referenced a report by Peabody Street Research published on May 5, 2022.  A true and correct copy of the Report published by Peabody Street Research is annexed as **Exhibit E**.

9.     Both the Hexin and St Hudson Complaints relied heavily on a Report published by Hindenburg Research (the "Hindenburg Report"), a known short-seller and then holder of short options on Singularity at the time its Report was published on May 5, 2022.  A true and correct copy of the Report published by Hindenburg Research is annexed as **Exhibit F**.

10.     By Order dated January 10, 2023, this Court consolidated the Hexin and St. Hudson Actions with another action captioned <u>Jinhe Capital Limited, et al v. Singularity Future Technology, Ltd, et al.</u> docket number 22-cv-08538(LJL).  A true and correct copy of the Court's consolidation order is annexed as **Exhibit G**.

**THE INSTANT MOTION**

11.     This Affirmation is respectfully submitted in support of Defendant's motion to dismiss both actions brought by the Hexin Plaintiffs and the St. Hudson Plaintiffs pursuant to <u>Fed. R. Civ. P.  12(b)(6).</u>

**Singularity Had a History as a Troubled Company With Numerous Improprieties Prior to Mr. Jie Joining the Company**

12.     Singularity Future Trading f/k/a Sino Global Shipping ("Singularity" or "Sino Global") has long been a troubled company with a historical pattern of its stock being described as nothing less than a "roller coaster" inevitably linked to questionable historical financial practices that predated Mr. Jie's tenure.  Singularity, operating under its predecessor name Sino Global, has numerous historical events that can be described as nothing less than a series of "red flags." **Exhibit E.**  The Peabody Report provides a significant roadmap to these red flags and the

3

checkered history of Singularity and/or Sino Global.  It should be noted that these events occurred before Defendant Yang Jie commenced his employment at Singularity.

13.     Sino Global has a history of delisting notices.  Looking back within the last decade prior to the filing of this lawsuit, Sino Global was a troubled company.  For example, on November 23, 2012, Sino Global filed a Form 8-K stating "[o]n November 21, 2012, Sino Global…received from the Nasdaq OMX Group…a letter (the "Nasdaq letter") indicating that it is not in compliance with Nasdaq Marketplace Rule 5550(b)(1) [for failing] to maintain a minimum of $2,500,000 in stockholder equity for continued listing. A true and correct copy of the November 23, 2012 Form 8-K is annexed as **Exhibit H.**

14.     As noted in the Peabody Report and confirmed through review of the SEC filings, Singularity's stock has undergone events that would lead to red flag classification.  In 2013, Sino Global sold independent Chinese business owner Zhong Zhang 1,800,000 shares of Sino Global stock at a price of $1.71 a share.  A true and correct copy of Sino Global's Notice of Fiscal Year 2013 Annual Meeting of Shareholders containing the details of the stock sale to Zhong Zhang is annexed as **Exhibit I.**  See **Exhibit E.** (Peabody Report).

15.     That was only part of the story. **In 2013 Sino Global's stock value** fluctuated between **$9.40 a share** and **$12.65 a share**.  A true and correct copy of a spreadsheet with historical data for Singularity obtained from the Nasdaq website with the daily share price history for Singularity is annexed as **Exhibit J.**[1]

16.      This seems incongruous for a company that posted **net losses** of **$2,576,896** for fiscal year ending in 2013 and a **net loss of $2,812,969** for fiscal year ending in 2012.  A true and correct copy of Sino Global's Form 10K filed on September 27, 2013 is annexed as **Exhibit K.**

---

[1] In this Affirmation, Singularity's historical share prices will be cited, each citation hereafter will be made with an implied reference to the historical share price as set forth in **Exhibit J.**

17.     Even more interesting was the fact that Sino Global admitted that the purpose of the sweetheart sale of stock to Mr. Zhang had a sole purpose of increasing its shareholder equity to be compliance with the NASDAQ notice, when Sino Global announced the sale of these shares had closed.  A true and correct copy of Sino Global's May 22, 2013 Form 8-K is annexed as **Exhibit L.**

18.     At a conservative valuation, the private placement sale of stock to Mr. Zhang came with an approximate discount of **$13 Million Dollars**.

19.     Naturally, Mr. Zhang's business entity Zhiyan Investment Group, developed as a major source of business for Sino Global's revenue.  **Exhibit E** (Peabody Report).  See also, A true and correct copy of Sino Global's Form 10-K filed on September 16, 2014 annexed as **Exhibit M.** ("We are substantially reliant on a single customer for a majority of our business.").

20.     For the fiscal year ending in 2014, Sino Global experienced an accumulated deficit of **$3.3 Million Dollars**.  Id.

21.     In 2014, Sino Global miraculously maintained a share price between **$7.25 a share** and **$16.45 a share**.  This was while the company maintained a deficit of **$2.6 Million Dollars** on its balance sheet.  Id.

22.     2015 was another tumultuous year for Sino Global, with its share price again fluctuating, and a failed venture to purchase a ship for its shipping purchase.  **Exhibit E.** (Peabody Report).

23.     On November 12, 2015, Sino Global filed a Form 8-K disclosing that Nasdaq issued a Notice of Delisting.  A true and correct copy of the November 12, 2015 Form 8-K is annexed as **Exhibit N.**

24.     In response to the Notice of Delisting, Sino Global decided, again, to issue 10,000,000 shares, by a Form S-8 filed on February 11, 2016.  A true and correct copy of the February 11, 2016 Form S-8 is annexed as **Exhibit O.**

25.     Later that year in 2016 and early 2017, numerous executives sold off a number of shares after a run-up of stock.  **Exhibit E.**

26.     All of the sales activity by insiders was done while the stock had a range between approximately **12** and **20 Dollars a share.** Id. See **Exhibit J.**

27.     In 2019, Nasdaq once again issued a Notice of Delisting of Sino Global's stock, which was disclosed on a July 23, 2019 Form 8-K.  A true and correct copy of the July 23, 2019 Form 8-K is annexed as **Exhibit P.**

28.     In 2019, Sino Global once again suffered a net loss, at the time, the greatest **net loss** ever tracking data since 2012 of **$7,012,113 Dollars**.  A true and correct copy of the September 30, 2019 Form 10-K is annexed as **Exhibit Q.**

29.     Sino Global's revenues also plunged by 84 percent.  Id.; **Exhibit E.**

30.     On January 3, 2020, Sino Global began to suffer corporate governance difficulties, as reflected in yet another Notice of Delisting that was disclosed by Form 8-K filed on January 3, 2020.  A true and correct copy of the January 3, 2020 Form 8-K is annexed as **Exhibit R.**

31.     Another Notice of Delisting was disclosed on January 21, 2020 on a Form 8-K.  A true and correct copy of the January 21, 2020 Form 8-K is annexed as **Exhibit S.**

32.     In 2020, Sino Global's stock price maintained an approximate average price of **$2 Dollars** per share.

33.     Despite this, Sino Global engaged in private placements sales of its stock, including one for 1,000,000 shares as disclosed on a Form 8-K filed on January 31, 2020.  A true and correct copy of the January 31, 2020 Form 8-K is annexed as **Exhibit T.**

34.     In 2020, Singularity also found another way to circumvent a Nasdaq delisting notice by entering into a 1 for 5 reverse stock split as disclosed in a Form 8-K dated and filed on July 6, 2020.  A true and correct copy of the July 6, 2020 Form 8-K is annexed as **Exhibit U.**

35.     In 2020, while posting a net loss, Singularity's shares traded between **$1.42 a share** and **$3.90 a share.**

36.     The first half of 2021 brought fierce activity on the part of Sino Global or Singularity, with a share price that would see steady rise with a reduction in price or value and another rise.  Sino Global's share price opened on January 4, 2021 with a share price of **$2.21 a share.**

37.     On January 25, 2021, the company filed a Registration Statement on Form S-1 relating to the sale of unregistered securities from some affiliated entities under a registration statement.  A true and complete copy of the January 25, 2021 Form S-1 is annexed as **Exhibit V.**

38.     The audited financials attached to the January 25, 2021 Registration Statement (Form S-1) notate a significant loss per share – a total of **$4.78 per share**, an **accumulated deficit** of **$23,421,594** dollar, an **operating loss** of **$17,738,104** and a **net loss** of **$17,928,647**.  Id.

39.     However, the markets did not reflect this information.  On January 25, 2021, Sino Global's stock closed at **$3.57 per share**.  On January 26, 2021, with dismal financials, the stock increased in value to **$4.24 per share**.  Sino Global's stock continued to rise in value closing at **$4.34** on January 27, 2021.

7

40.     On January 28, 2021, another private offering of stock was announced through a Form 8-K disclosure, consistent with Sino Global's prior poor cash position, but inflated share prices.  A true and completed copy of the January 28, 2021 Form 8-K is annexed as **Exhibit W.**

41.     Consequently, that same day, January 28, 2021, Sino Global's shares rose to **$5.04 per share**.

42.     On January 29, 2021, there was reorganization of some management of Sino Global pursuant to a Form 8-K filing made the same day where Sino Global made staffing changes to its Chief of Operations and Chief Technology Officer.  A true and correct copy of the January 29, 2021 Form 8-K is annexed as **Exhibit X.**

43.     With the change in directors, Sino Global's stock rose again to a price of **$5.87 pershare** on January 29, 2021.

44.     On February 3, 2021, Sino Global filed a Form 8-K stating "its newly appointed Chief Operating Officer Mr. Lei Nie and Chief Technology Officer Mr. Xintang You will spearhead the Company's effort to enter Bitcoing mining as part of its 2021 development strategy."  A true and correct copy of the February 3, 2021 Form 8-K and the accompanying press release are annexed as **Exhibit Y.**

45.     That same day, on February 3, 2021, Sino Global's stock closed at **$7.44 a share**.

46.     On February 8, 2021, another Form 8-K was filed announcing, yet another private placement offering resulting in cash flow of over $13.5 million dollars to the company.  A true and correct copy of the February 8, 2021 Form 8-K is annexed as **Exhibit Z.**

47.     That same day, February 8, 2021, Sino Global's stock closed at one of its high points for 2021 at **$11.00 a share** with, yet again, another volume of over **20 Million Shares**.

8

48.     The Edgar database lists other private placements injecting cash into the company disclosed on Form 8-Ks in 2021.  A true and correct copy of the EDGAR docket sheet is annexed as **Exhibit AA**

### There was Public Information About Mr. Jie in the Market Before Mr. Jie Joined Sino-Global and Before the Plaintiffs Entered into the Stock Purchase Agreements

49.     Plaintiffs in both actions make overtures about Mr. Jie's previous history in relation to Singularity or Sino Global. **Exhibit A** ¶¶45-60; **Exhibit C** ¶¶53-64.  Plaintiffs further make allegations, as though the Hindenburg Report was somehow biblical or groundbreaking.  Id.

50.     However, although allegations are made as though this was somehow a corrective disclosure, however this is simply not the case.

51.     The allegations, which Mr. Jie vehemently denies, made in the complaints related to a failed reverse merger and $3.5 million (Hexin Compl. ¶49, St. Hudson Compl. ¶54) were readily available to the public market based on a New York County Supreme Court case filed in 2018 captioned Shanghai Nonobank Financial Info. Serv., Co., Ltd. v. Yang Jie, et al. under index number 653834/2018.  A true and correct copy of the complaint filed in that matter is annexed as **Exhibit BB.**

52.     The Complaint, which was electronically available and easily obtainable by searching Yang Jie's name, contains each allegation related to the failed reverse merger as stated in both the Hexin and St. Hudson Complaints, *Compare* **Exhibit BB** *with* Hexin Compl. ¶49 and St. Hudson Compl. ¶54

53.     What Plaintiffs' Complaints do not reveal and what the Hindenburg report does not reveal is that the Shanghai Nonobank action against Mr. Jie even ever existed or the fact that it was voluntarily discontinued by so-ordered stipulation on March 13, 2020, well before Mr. Jie's

employment with Sino Global or Singularity began.  A true and correct copy of the stipulation of discontinuance filed in the <u>Shanghai Nonobank</u> action is annexed as **Exhibit CC.**  Consequently, no judgment or other judicial decree of liability or obligation came as a result of the litigation.

54.     Curiously, ¶33 of the <u>Shanghai Nonobank</u> complaint contains allegations containing information, for which the Plaintiffs in both actions allege that they could not have discovered even with the exercise of due diligence.  Hexin Compl. ¶91 St. Hudson Compl. ¶100 .  Those allegations are of Mr. Jie's alleged criminality in China, which Mr. Jie expressly denies.

55.     In fact, the allegations in the <u>Shanghai Nonobank</u> complaint, filed in 2018 mirror the allegations made in the Peabody Street Research Report.  *Compare* Shanghai Nonobank Compl ¶33 **Exhibi BB** *with* Peabody Street Research Report. **Exhibit E.**

56.     Furthermore, an English language website, Capitalwatch, contains a news article from August 25, 2018 that cites the same information, and upon information and belief, the same story cited by the Peabody Research Report. **Exhibit E.**

57.     As an additional manner, the Complaints both argue that there was a misrepresentation in Singularity's November 1, 2021 8-K filing were incorrect due to a discrepancy of Mr. Jie's tenure at China Commercial Credit, Inc. ("CCCR") alleging the statement as "inaccurate and false," which is simply not true.  In fact, the only position that the CCCR 8-K filing, alleged by plaintiffs to underpin a claim for material misrepresentation, referenced Mr. Jie resigning from was as Vice President Finance at CCCR, and does not reference Mr. Jie ending his tenure at CCCR as General Manager.

58.     Thus, it is quite obvious that Mr. Jie joined Sino Global/Singularity with all of this information in the public market.

**Singularity's Stock Price Did Not Show Any Reaction Toward Mr. Jie Joining Sino Global/Singularity.**

59.     Mr. Jie commenced his employment with Sino Global in January, 2021.  A true and correct copy of the Form 8-K dated November 10, 2021 is annexed as **Exhibit DD.**

60.     On November 10, 2021, it was announced by Sino Global in a form 8-K that Mr. Yang Jie would be assuming the role as Chief Executive Officer of Sino Global, soon to be Singularity.  **Exhibits A and C.**

61.     The Complaints both contain allegations that a press release by Sino Global was materially misleading for classifying Mr. Jie as an "outstanding executive" and "has the insight and judgment to deliver the leadership we need today."  Hexin Compl. ¶56; St. Hudson Compl. ¶63.

62.     It is notable that Sino Global's share price closed with a share price of $3.41 a share, a loss of $0.08 for the day when Mr. Jie's hiring was announced and filed with the Securities and Exchange Commission (the "SEC").

63.     Two days later, on November 12, 2021, Sino Global filed its Form 10-Q and the shares closed at $3.74 per share.

64.     The Form 10-Q disclosed the sale of the 2021 warrants referenced in both the Hexin Complaint and the St. Hudson Complaint. A true and complete copy of the November 12, 2021 Form 10-Q is annexed as **Exhibit EE.**

65.     The November 12, 2021 Form 10-Q revealed a **working capital deficit** of **$40,615,598** for the company, with a **net loss** of **$2,921,662** for the first three quarters of 2021; just two days after Mr. Jie was announced as Chief Executive Officer. Id. The continued sustained burning of cash and working capital deficit would be a red flag to any investor, let alone a sophisticated investor.

66.     Sino Global's November 2021 disclosure exhibited a company with an identity problem, it was still involved in the shipping industry, while showing a diversification into the cryptocurrency market, a relatively new market for an international freight forwarding company. **Exhibit EE**.

67.     Sino Global's stock closed the following Monday November 15, 2021 with a price of $4.17 per share.

68.     On November 19, 2021, it was announced in a Form 8-K that Mr. John Levy was appointed as an independent board member.  A true and correct copy of the November 19, 2021 Form 8-K is annexed as **Exhibit FF.**

69.     Sino Global's stock closed down for that day with a price of $3.58 per share.

70.     Sino Global's stock continued with a downward trend closing at a low price of $3.05 per share on December 3, 2021, which gradually increased to a price of $3.50 per share on December 10, 2021, one month after Mr. Jie was hired.

71.     On December 14, 2021, Sino Global entered into the subject Stock Purchase Agreements and disclosed same on a Form 8-K.  A true and correct copy of the December 14, 2021 Form 8-K is annexed as **Exhibit GG.**

72.     Sino Global's stock closed down on December 14, 2021 with a price of $3.50 per share, after the announcement.

73.     Sino Global's stock closed up at $4.49 a share on December 31, 2021.

74.     On January 4, 2022, Sino Global's stock closed at $5.19 per share.

75.     On January 5, 2022, Sino Global filed a Form 8-K announcing a change in the company's name, with an accompanying amendment to the company's articles of organization to reflect the Singularity name.  The accompanying press release indicated the name change was to

12

align the company with cryptocurrency markets.  A true and complete copy of the January 5, 2022 Form 8-K is annexed as **Exhibit HH.**

76.     That day, Sino Global/Singularity's stock closed down at $1.07 per share.

77.      On January 11, 2022, Singularity filed a Form 8-K announcing that its joint venture with Thor Miner and entered into a purchase and sale agreement for cryptocurrency mining hardware with SOS Information Technology New York for $200 million dollars.  A true and complete copy of the January 11, 2022 Form 8-K is annexed as **Exhibit II.**

78.     After the Form 8-K filing on January 11, 2022, Singularity's stock closed down at 6 cents to $4.40 per share.

79.     Three days later, on January 14, 2022, another Form 8-K was filed amending the joint venture announcement to include a statement that the joint venture received a payment of $40 million.  A true and complete copy of the January 14, 2022 Form 8-K amendment is annexed as **Exhibit JJ.**

80.     In the days after the joint venture announcement, Singularity's stock rose to $4.42 per share on January 25, 2022, decreasing to $3.56 per share on January 27, 2022, and increasing to $5.48 per share on February 4, 2022.

81.     On February 7, 2022, Singularity's stock price rose and closed at $6.08 per share, however, that day there was also a disclosure that over one million warrants were exercised by the filing of a Schedule 13-G.  A true and correct copy of the February 7, 2022 Schedule 13-G is annexed as **Exhibit KK.**

82.     On February 14, 2021, Singularity filed another Form 10-Q quarterly report reflecting a significant net loss of $11,840,032 for the end of year 2021, a tenfold increase over the previous year, in addition to an increase deficit of $41,953,051, approximately ten million

dollars more than the previous year.  A true and correct copy of the February 14, 2021 Form 10-Q is annexed as **Exhibit LL**

83.     Singularity's stock closed at $6.38 per share the same date of the dismal financial reports that were filed with the SEC, with mounting losses by the cash starved company.

84.     Singularity's stock continued to increase in value to $7.43 per share on March 9, 2022.

85.     On March 10, 2022, Singularity continued its path of unregistered securities sales, announcing restructuring of $10 million in corporate debt by a Form 8-K filing.  A true and correct copy of the March 10, 2022 Form 8-K is annexed as **Exhibit MM**

86.     Singularity's stock closed at $7.27 per share on March 10, 2022.

87.     Singularity's stock then had a steady increase, and a $2 dollar spike to close at $9.44 per share on March 16, 2022, then closing again at $10.24 per share on March 17, 2022.

88.     There was then a decline in share price and a spike again to close at $11.53 per share on March 25, 2022.

89.     Singularity's stock then increased, again without any corporate activity, to reach $17.00 per share on April 5, 2022, and then $19.78 per share on April 7, 2022.

90.     Curiously, however, the stock dropped $7 dollars in value on April 8, 2022, when the stock closed at $12.65 per share.

91.     After the weekend, on April 11, 2022, Singularity's stock cratered to $7.08 per share, again, without any activity on the SEC website, even with a press release of a joint venture agreement.  See, infra ¶35.

92.     On April 13, 2021, Singularity's stock closed at $8.41 per share, yet again.

14

93.     On April 14, 2021, Singularity filed a Form 8-K announcing a joint venture agreement with Golden Mainland for bitcoin mining sites of 300,000 machines, with an aggregate joint investment resulting in Singularity being the majority shareholder.  A true and correct copy of the April 14, 2021 Form 8-K filing is annexed as **Exhibit NN**.

94.     Even with that filing with the SEC, the market, if that who is really trading the stock, yawned and the share price fell to 6.46 per share.

95.     Singularity's stock dipped and increased again closing at a share price of $6.75 per share on May 4, 2022.

**SINGULARITY'S STOCK FELL SIGNIFICANTLY FROM ITS PEAK PRIOR TO THE RELEASE OF THE HINDENBURG AND PEABODY STREET REPORTS.**

96.     As referenced in both Complaints, two short-seller reports were released on May 5, 2022: The Hindenburg Report (**Exhibit F**) and a Report by Peabody Street Research (**Exhibit E**). Hexin Compl.; St. Hudson Compl..

97.     The Plaintiffs' Complaints were naturally fixated on the Hindenburg Report, with a mere reference to the Peabody Street Research report, with not a single citation, only referencing it being similar.  Hexin Compl.; St. Hudson Compl.

98.     Page 23 of the Hindenburg Report reveals that Hindenburg had an active short position on Singularity.  **Exhibit F.**  Naturally, Hindenburg Research stood to realize significant financial gains by a stock value decrease. Id.

99.     The Hindenburg Report was filled with unverified references to events that occurred, and was targeted to one person, ignoring the numerous red flags that existed. Id.

100.    Conversely, the Peabody Street Research Report, while not perfect, contains just a page and a half targeted at Mr. Jie, but mostly focused on the red flags described within this statement of facts.  **Exhibit E.**

101.    Unlike the Hindenburg Report that was a complete assault on Mr. Jie, the Peabody Street Research Report merely dedicates two pages to Mr. Jie, disclosing an English language United States based source of Mr. Jie's history, then moves on to Singularity's history.  Id.

102.    The Peabody Report focuses in on 1) insider trading that occurred at Singularity that they alleged started far before Mr. Jie's tenure; 2) Singularity's declining legacy shipping business; 3) Singularity's failed business venture with a Chinese Ship; 4) insider trading in 2016 after a run up in share price that followed a delisting notice; 5) Singularity's dismal financial statements; 6) cryptocurrency deals; 7) joint ventures that appear to be going nowhere; and 8) various business improprieties.  **Exhibit E.**

103.    Conversely, the Hindenburg Report ignores the historical improprieties and focuses on one person, Mr. Jie. **Exhibit F.**  It appears as though the Hindenburg Report was almost too tailor-made for the instant litigation.

104.    Neither the Peabody Report nor the Hindenburg Report released any new ground-shaking or earth-shattering information that was not already in the market, as exhibited above.

105.    In fact, the Hindenburg Report contains material inaccuracies relating to Singularity, attempting to tie everything to Mr. Jie and scapegoat him in an effort to "feather their nest."

106.     For example, the Hindenburg Report attempted to tie Sino Global/Singularity's move toward cryptocurrency to Mr. Jie's employment.

16

107.    Furthermore, the Hindenburg Report was largely unverified data, which was consequently reflected in both Plaintiffs' complaints.

108.    However, the inference led by Hindenburg Research ignores the fact that the press release from Sino Global/Singularity was issued by its predecessor, Lei Cao.

109.    Regardless, the share price for Singularity decreased to **$4.80 per share** and remained in the high **$4 dollar** range.

## THE WARRANTS THAT PLAINTIFFS COMPLAIN WERE NOT DISCLOSED WERE ALREADY PUBLIC INFORMATION AND DISCOVERABLE TO ANY PARTY WITH A DUTY TO PERFORM DUE DILIGENCE.

110.    As noted below in this affirmation, the Hexin and St Hudson Plaintiffs both complain that there were three warrants that were allegedly not disclosed.  However, these were available to the public as part of required filings on the SEC Edgar system.

111.    On March 12, 2018, then Sino Global filed a Form 8-K disclosing an unregistered sale of securities/warrants, this was part of the group of warrants complained of by the Hexin and St. Hudson Plaintiffs in their respective Complaints.  A true and correct copy of the March 12, 2018 Form 8-K, Purchase Agreement, and Forms of Warrant are collectively annexed as **Exhibit OO**.

112.    The form of Series A warrant attached to the March 12, 2018 Form 8-K filing clearly indicates that those warrants issued contained a sunset date of September 14, 2023, well after the Hexin and St Hudson Plaintiffs entered into the agreement with Sino Global, now Singularity. **Exhibit OO**.

113.    On February 8, 2021, then Sino Global filed a Form 8-K disclosing an unregistered sale of securities/warrants, this was part of the group of warrants complained of by the Hexin and

St. Hudson Plaintiffs in their respective complaints.  A true and correct copy of the February 8, 2021 Form 8-K, Purchase Agreement, and Forms of Warrant are collectively annexed as **Exhibit PP**.

114.    The form of warrant attached to the February 8, 2021 Form 8-K filing clearly indicates that those warrants issued contained a sunset date in August, 2026, well after the Hexin and St Hudson Plaintiffs entered into the agreement with Sino Global, now Singularity. **Exhibit PP**.

115.    On February 10, 2021, then Sino Global filed a Form 8-K disclosing an unregistered sale of securities/warrants, this was part of the group of warrants complained of by the Hexin and St. Hudson Plaintiffs in their respective complaints.  A true and correct copy of the February 10, 2021 Form 8-K and all exhibits is collectively annexed as **Exhibit QQ**.

116.    The form of warrant attached to the February 10, 2021 Form 8-K filing clearly indicates that those warrants issued contained a sunset date in August, 2026, well after the Hexin and St Hudson Plaintiffs entered into the agreement with Sino Global, now Singularity. **Exhibit QQ**.

### THE PLAINTIFFS' COMPLAINTS WERE FILED BASED ON UNVERIFIED HEARSAY EVIDENCE AND BASED ON INFORMATION THAT WAS IN THE PUBLIC MARKET.

117.    It was based on these facts that the Hexin Plaintiffs filed their Complaint on September 23, 2022 (**Exhibit A**) and the St. Hudson Plaintiffs filed their Complaint on December 5, 2022 (**Exhibit C**).

### THE HEXIN COMPLAINT – SECURITIES PURCHASE AGREEMENT

118.    The Complaint filed by the Hexin Plaintiffs was premised on a Securities Purchase Agreement between the named plaintiffs and Singularity on December 14, 2021. **Exhibit B.**

119.     The Hexin Complaint itself was for the purchase and sale of unregistered securities, as the Plaintiffs alleged. Id.

120.     However, the Stock Purchase Agreement contains several critical sections that the Hexin Complaint does not address.

121.     The most critical aspect of the Stock Purchase Agreement not addressed in the complaint is addressed in Section 2.2 of the SPA, entitled "Representations and Warranties of the Purchaser." **Exhibit B.**

122.     Under Section 2.2(d) "Information" contains the critical language stating:

> The purchaser understands that its investment in the Securities involves a significant degree of risk.  The Purchaser further represents to the Company that the Purchaser's decision to enter into this Agreement has been **based solely on the independent evaluation of the Purchaser and its representatives.**
>
> **Exhibit B** (emphasis added).

123.     Under Section 2.2(l) captioned "Independent Investment Decision," the Plaintiffs further represented and warranted that:

> Such purchaser has **independently evaluated the merits of its decision to purchase Securities pursuant to this agreement, <u>and such Purchaser confirms that it has not relied on the advice of any other person's business and/or legal counsel in making such decision</u>…The Company has recommended to the Purchaser that Such Purchaser obtain its own professional advisors.  Such Purchaser has consulted such legal, tax and investment advisors as it, in its sole discretion…**
>
> Id. (emphasis added).

124.     These two representations are the critical component of the transaction in this matter, and clearly show that there were numerous red flags in terms of financial data versus share price that trigger the duty to inquire and perform due diligence, as elaborated in the case law in the accompanying brief.

125.     However, Plaintiffs wish to make a distinction without a difference and focus on other warranties in Section 2, which are addressed in the accompanying brief.

126.     Furthermore, as exhibited above, even in the Sections of the agreement where Plaintiffs attempt to grasp at straws, the statements of Singularity are truthful, based on the detailed history.

127.     Section 2.1(k) has relevant language that states "[t]o the knowledge of the company, there are no outstanding orders, judgments, injunctions, awards or decrees of any court, arbitrator, or government or regulatory body against the Company, the Subsidiaries or any of their respective executive officers, or directors in their capacities…" Id.

128.     As noted previously, the Shanghai Nonobank lawsuit related to Mr. Jie that was not alleged in either complaint had been discontinued without a finding of liability in a stipulation of discontinuance that was so ordered by the Court.  See, **Exhibit CC.**

129.     Furthermore, the Stock Purchase Agreement contains a full and complete integration clause:

> This Agreement contains the entire understanding and agreement of the parties with respect to the matters covered hereby and, except as specifically set forth herein, neither the Company nor the Purchaser makes any representations, warranty, covenant or undertaking with respect to such matters and the supersede all prior understandings and agreements with respect to said subject matter, all of which are merged herein…

**Exhibit B** at Section 7.3

130.     Thus, it can be concluded that every allegation made by the Plaintiffs is clearly frivolous and an attempt to buttress a suit that is nothing more than a shareholder strike suit.

**THE HEXIN COMPLAINT**

131.    The Hexin Complaint was filed on September 23, 2022, and described pre-market negotiations in 2 paragraphs:

> 25. In September 2021, Plaintiffs were introduced to Cao and Jie to discuss Plaintiffs' potential investments in Singularity…
>
> 26.  Cao and Jie told Plaintiffs' representatives that Singularity was on the verge of incredible growth because it was about to pursue a new line of business focusing on blockchain technologies.
>
> **Exhibit A** at ¶¶25-26

132.    The Complaint contains no further information, negotiations, due diligence, or any other tasks taken, just that Plaintiffs got a sales pitch without substance, on a day in September, 2021, not saying where, and they decided to buy into Sino-Global at the time.  Hexin Compl. **Exhibit A**  at ¶¶ 25-27.

133.    The Hexin Complaint then pled that the company received money and Plaintiffs received shares at a value.  <u>Id.</u> ¶ 28.

134.    The Hexin Complaint then states standard allegations regarding a purchase pursuant to Section 144.  <u>Id.</u> ¶¶ 29-30.

135.    The Hexin Complaint, however, confuses who the contracting party is by attempting to state that Jie and Cao made representations through the Hexin Agreement.  ¶32; ¶34.

136.    The Hexin Complaint, itself, is between Singularity and the Hexin Plaintiffs, with no provision for personal liability.  This is evidenced by Singularity being the contracting party on the signature page. **Exhibit B.**

137.    Furthermore, the Hexin Complaint is scant on details regarding negotiations, and does not set forth the date, time and place of the alleged representations. **Exhibit A** ¶¶25-26.

22966227v.1

138.     Regarding the warrants, the Hexin Plaintiffs plead non-disclosure, but do not include the facts that the warrants were disclosed by three filings of SEC Form 8K at or around the time of issuance. **Exhibit A ¶¶**41. <u>See</u>, ¶¶109-115, <u>supra</u>,, **Exhibits OO, PP, and QQ.**

139.     Additionally, the Hexin Complaint pleads that the Defendants were involved in a conspiracy with no additional details supporting the conspiracy.  Hexin Compl. **Exhibit A ¶42.** ("the Leadership Defendants, upon information and belief, conspired to use the funds…")

140.     The Hexin Complaint further vigorously cites sections of the Hindenburg Report beginning at ¶44, and only makes a single reference to the Peabody Report.  Hexin Compl. **Exhibit A ¶44.**

141.     The Hexin Complaint has no allegations to exhibit that Plaintiff's counsel in the Hexin Matter personally investigated the claims asserted herein, the Hexin Complaint does not state that any of the claims are made upon information and belief.  Hexin Compl. **Exhibit A.**

142.     As to the allegations of criminal history, the Hexin Complaint makes vigorous citations to the Hindenburg Report. Hexin Comp. **Exhibit A ¶¶45-48**.

143.     The Hexin Complaint makes references to Yang Jie allegedly being "a fugitive wanted by Chinese law enforcement officials for perpetrating a $300 million Ponzi scheme." Hexin Compl. **Exhibit A ¶45.**

144.     The Hindenburg Report, however, only makes citations to media sources with anonymous, and unverified reports.  Further, citations to alleged documents in the Hindenburg Report lead to unverified and unattested documents that were translated through the Google Translate platform.  **Exhibit F** (The Hindenburg Report).

145.     ¶¶46-48 of the Hexin Complaint make allegations that are linked to the Hindenburg Report, which references the same anonymous and unverified reports in addition to the same

22

unverified and unattested documents translated through Google Translate.  Hexin Compl. **Exhibit A ¶¶46-48; Exhibit F** (Hindenburg Report).

146.    ¶¶49-51 of the Hexin Complaint make the same allegations as were made in the Shanghai Nonobank matter without referencing the Shanghai Nonobank matter, instead referencing the Hindenburg report that also does not cite the action.  Hexin Compl. **Exhibit A**

147.    The Hexin Complaint also does not include the fact that the action against Mr. Jie in New York Supreme Court was discontinued.  Id. The Hindenburg Report also does not include those facts.  **Exhibit F** (Hindenburg Report).

148.    Instead, the Hexin Complaint omits the fact that the Shanghai Nonobank matter even existed, nor does it reference that it was no longer an active litigation.  **Exhibit A.**

149.    The Hexin Complaint then makes allegations that there was a misrepresentation on the Form 8-K for Mr. Jie, regarding legal actions alleging a violation of Section 2.2(k) of the Stock Purchase Agreement.  Hexin Compl. **Exhibit A** ¶54.

150.    This allegation is one of many that are contradicted by the record on this motion, as noted above.

151.    Additionally, the Hexin Complaint omits information relating to Singularity's stock price, as referenced in detail above by date and event, instead attributing Singularity's rise and fall to Mr. Jie and the release of the Hindenburg Report.  Hexin Compl. **Exhibit A ¶57.**

152.    However, this allegation is contradicted by the fact that the share price of Singularity reached its peak price of $19.78 per share on April 7, 2022 and fell to $6.75 per share on May 4, 2022, the day before the Hindenburg Report was published.  **Exhibit J.**

23

153.     The data from Nasdaq exhibits that Singularity's share price was in a decline before the Hindenburg Report and continued to retreat, the data also exhibits that there was no correlation between Singularity's share price and the Hindenburg Report's release.  **Exhibit J.**

154.     The Hexin Complaint then pleads in Count I, allegations of common law fraud premised on the same allegations omitting public information and with citation to unverified sources.  Hexin Compl. **Exhibit A** ¶77-78.

155.     The fraud allegation in the complaint are connected to terms such as reckless and "fraudulently induced" without further substance.  Hexin Compl. **Exhibit A** ¶¶79-84.

156.     The fraud count continues to make bare allegations using bare legal terms such as detrimental reliance.  Hexin Compl. **Exhibit A** ¶93.

157.     Plaintiffs further crown the fraud allegations and show complete obliviousness toward what was available through reasonable diligence with their allegation "Plaintiffs' reliance on each of the foregoing misstatements and omissions was both reasonable and justified because **they could not have discovered the truth with reasonable diligence**." Hexin Compl. **Exhibit A** ¶94 (emphasis added).

158.     As to the fraud, the Hexin Complaint makes no real allegations about causation, much like the diligence allegations. Hexin Compl. **Exhibit A.**

159.     The balance of the allegations in the fraud claim contain further representations alleging that reliance on alleged misstatements and omissions "because [the defendants] were in the superior position of knowledge and are the only ones to know if these representations were true." Hexin Compl. **Exhibit A ¶96.**

160.     The allegation in the Hexin Complaint, however, is contradicted by the clear record as set forth in the motion with SEC filings and public records.

24

161.    The allegations in Count VI of the Hexin Complaint related to allegations of violations of Section 10(b) of the Exchange Act and under Rule 10b-5 likewise rely on the allegations of common law fraud. Hexin Compl. **Exhibit A.**

162.    The remaining allegation against Mr. Jie relates to liability under Section 20(a) of the Exchange Act.  Hexin Compl. **Exhibit A ¶¶**161-167.

163.    It was based on these facts that the Hexin Plaintiffs filed their Complaint on September 23, 2022 (**Exhibit A**).

### THE ST HUDSON COMPLAINT – SECURITIES PURCHASE AGREEMENT

164.    The Complaint filed by the St Hudson Plaintiffs was premised on a Securities Purchase Agreement between the named plaintiffs in the St. Hudson Complaint and Singularity. **Exhibit C**

165.    The St Hudson Complaint itself was for the purchase and sale of unregistered securities, as the Plaintiffs alleged. Id.

166.    However, the St. Hudson Securities Purchase Agreement contains several critical sections that the St. Hudson Complaint does not address.

167.    The Securities Purchase Agreement that the St. Hudson Plaintiffs place their reliance on contains the same terms that that the Hexin Stock Purchase Agreement contains. *Compare* Hexin Stock Purchase Agreement **Exhibit B** *with* the St. Hudson Stock Purchase Agreement. **Exhibit D.**

168.    With this fact, ¶¶102-111 of this Affirmation are incorporated by reference herein, as those provisions are duplicates of the provisions in the St. Hudson Stock Purchase Agreement. **Exhibit D.**

### THE ST. HUDSON COMPLAINT

169.    The St. Hudson Complaint was filed on December 5, 2022, and described pre-market negotiations in an oral presentation without any materials by which the St. Hudson Plaintiffs could rely.  St. Hudson Compl. **Exhibit C** ¶¶26-29.

170.    The St. Hudson Complaint contains no further information, negotiations, due diligence, or any other tasks taken, just that the St. Hudson Plaintiffs received sales pitches with minimal substance, on a minimum of three occasions.  St. Hudson Compl. **Exhibit C** ¶¶26-29.

171.    The St. Hudson Complaint does not include any written sales materials, but states that based on minimal oral presentations that "the Plaintiffs were so convinced of the legitimacy of Defendant Jie and Cao's representations that they were prepared to invest."  St. Hudson Compl. **Exhibit C** ¶30 <u>see also</u> ¶31.

172.    The St. Hudson Complaint does allege that photographs of crypto mining machines were provided to the Plaintiffs, but does not include those photographs.  St. Hudson Compl. **Exhibit C** ¶32.

173.    The Hexin Complaint then pled that the company received money and Plaintiffs received shares at a value with no other allegations regarding benefits received.  St. Hudson Compl. **Exhibit C** ¶35.

174.    The Hexin Complaint then states standard allegations regarding a purchase pursuant to Section 144.  <u>Id.</u> ¶¶ 36-37.

175.    The St. Hudson Complaint, however, confuses who the contracting party is by attempting to state that Jie and Cao made representations through the St. Hudson Agreement. St. Hudson Compl. **Exhibit C**  ¶39, ¶41.

26

176.     The St Hudson Agreement, itself, is between Singularity and the St Hudson Plaintiffs, with no provision for personal liability.  This is evidenced by Singularity being the contracting party on the signature page. **Exhibit D.**

177.     Regarding the warrants, the St Hudson Plaintiffs plead non-disclosure, but do not include the facts that the warrants were disclosed by three filings of SEC Form 8-K at or around the time of issuance. **Exhibit C** ¶49. ¶¶109-115, supra. **Exhibits OO, PP and QQ.**

178.     Additionally, the St. Hudson Complaint pleads that the Defendants were involved in a conspiracy with no additional details.  St. Hudson Compl. **Exhibit C** ¶**50** ("the Leadership Defendants, upon information and belief, conspired to use the funds…")

179.     The St Hudson Complaint further vigorously cites sections of the Hindenburg report beginning at ¶50, and only makes a single reference to the Peabody Report.  St. Hudson Compl. **Exhibit C.**

180.     The St. Hudson Complaint has no allegations to exhibit that Plaintiff's counsel in the Hexin Matter personally investigated the claims asserted herein, the Complaint does not state that any of the claims are made upon information and belief.  St. Hudson Compl. **Exhibit C.**

181.     As to the allegations of criminal history, the complaint makes vigorous citations to the Hindenburg Report. St. Hudson Compl. **Exhibit C** ¶¶**53-55**.

182.     The St. Hudson Complaint makes references to Yang Jie allegedly being "a fugitive wanted by Chinese law enforcement officials for perpetrating a $300 million Ponzi scheme." St. Hudson Compl. **Exhibit C** ¶**53.**

183.     The Hindenburg Report, however, only makes citations to media sources with anonymous, and unverified reports.  Further, citations to alleged documents in the Hindenburg

27

Report lead to unverified and unattested documents that were translated through the Google Translate platform. **Exhibit F.** (The Hindenburg Report).

184.      ¶¶53-55 of the St. Hudson Complaint makes allegations that are linked to the Hindenburg Report, which references the same anonymous and unverified reports in addition to the same unverified and unattested documents translated through Google Translate.  St. Hudson Compl. **Exhibit C ¶¶53-55; Exhibit F** (Hindenburg Report).

185.      ¶54of the St. Hudson Complaint make the same allegations as were made in the Sinobank matter without referencing the Sinobank matter, instead referencing the Hindenburg Report that also does not cite the action.  St. Hudson Compl. **Exhibit C**

186.      The Hexin Complaint also does not include the fact that the Shanghai Nonobank action against Mr. Jie in New York Supreme Court was discontinued.  Id. The Hindenburg Report also does not include those facts.  **Exhibit F.**

187.      Instead, the St. Hudson Complaint omits the fact that the Shanghai Nonobank matter even existed, let alone that was no longer an active litigation and was discontinued by so-ordered stipulation.  **Exhibit C.**

188.      The St. Hudson Complaint then continues onward, making allegations that there was a misrepresentation on the Form 8-K for Mr. Jie, regarding legal actions alleging a violation of Section 2.2(k) of the Stock Purchase Agreement.  St. Hudson Compl. **Exhibit C ¶¶56-58**

189.      This allegation is one of many that are contradicted by the record on this motion, as noted above.

190.      Additionally, the Complaint omits information relating to Singularity's stock price, as referenced in detail above by date and event, instead attributing Singularity's rise and fall to Mr. Jie and the release of the Hindenburg Report.  St. Hudson Compl. **Exhibit C ¶61, 63.**

191.    However, this allegation is contradicted by the fact that the share price of Singularity reached its peak price of $19.78 per share on April 7, 2022 and fell to $6.75 per share on May 4, 2022, the day before the Hindenburg Report was published.  **Exhibit J.**

192.    The St. Hudson Complaint also falsely alleges that the share decline from $19.86 per share occurred after the Hindenburg and Peabody Street Reports were issued.  St. Hudson Compl. **Exhibit C ¶63.**

193.    However, the share peak price was on April 7, 2022, approximately one month before the Hindenburg and Peabody Street Reports were issued. **Exhibit J**.

194.    The data from Nasdaq exhibits that Singularity's share price was in a decline before the Hindenburg Report and continued to retreat, the data also exhibits that there was no correlation between Mr. Jie's hiring and Singularity's share price.  **Exhibit J**

195.    The Complaint then pleads in Count I, allegations of violations of Section 10(b) of the Exchange Act and on Rule 10b-5 on the same allegations omitting public information and with citation to unverified sources. St. Hudson Compl. **Exhibit C ¶¶86-87**.

196.    The securities violation allegations in the Complaint are connected to terms such as reckless without further substance.  St. Hudson Compl. **Exhibit C ¶¶95-99**

197.    The securities violation allegations count continues to make bare allegations using bare legal terms such as detrimental reliance.  St. Hudson Compl. **Exhibit C ¶102**.

198.    Plaintiffs further crown the securities violation allegations and show complete obliviousness toward what was available through reasonable diligence with their allegation "Plaintiffs' reliance on each of the foregoing misstatements and omissions was both reasonable and justified because **they could not have discovered the truth with reasonable diligence**." St. Hudson Compl. **Exhibit C ¶103** (emphasis added).

199.    As to the securities violation allegations, the Complaint makes no real allegations about causation, much like the diligence allegations. St. Hudson Compl. **Exhibit C.**

200.    The balance of the allegations in the fraud contain further representations alleging that reliance on alleged misstatements and omissions "because [the defendants] were in the superior position of knowledge and are the only ones to know if these representations were true." St. Hudson Compl. **Exhibit C ¶105.**

201.    The allegation in the complaint, however, is contradicted by the clear record as set forth in the motion with SEC filings and public records.

202.    The allegations in Count III for common law fraud likewise rely on the allegations of securities violation. St. Hudson Compl. **Exhibit C**

203.    The remaining allegation against Mr. Jie relates to liability under Section 20(a) of the Exchange Act.  St. Hudson Compl. **Exhibit C ¶¶109-115.**

204.    It was based on these facts that the St. Hudson Plaintiffs filed their Complaint on December 5, 2022.  **Exhibit C.**

205.    Defendant Yang Jie engaged the Chinese Law Firm Zhonglun W&D Law Firm ("Zhonglun Firm Report") to perform an investigation whether Mr. Jie has or had any pending criminal charges, convictions, or other evidence of Criminality in China.  A true and correct copy of the Zhonglun Firm Report is annexed as **Exhibit RR.**

206.    The Zhonglun Firm Report eviscerates the  underlying Complaints at bar. Simply put, the Hindenburg Report falsely and recklessly asserts criminality on the part of Mr. Jie. We now know that the Chinese authorities did not charge Mr. Jie with these crimes. In fact, others were charged and convicted of such crimes. Id.

207.    The Zhonglun Firm Report continues to state that the criminal action in China reached a final judgment and no conviction was entered against Mr. Jie. Id.

208.    Furthermore, Mr. Jie was not even submitted to the prosecutor's office in China. Id.

209.    Finally, there are not and have not been pending criminal charges in China, pursuant to the investigation and results set forth in the Zhonglun Firm Report. Id.

**WHEREFORE**, it is respectfully requested that the Court grant the instant motion to dismiss in its entirety and dismiss both the Hexin Action and the St. Hudson Action with prejudice.

New York, New York
Dated: February 10, 2023

**BECKER & POLIAKOFF, LLP**

By: _____

James J. Mahon, Esq. (JM5405)
*Attorney for*
*Defendant Yang "Leo" Jie*
45 Broadway, 17th Floor
New York, New York 10006
Phone: 212-599-3322
Fax: 212-557-0295

31